In the Matter of Proving the Last Will and Testament of
GEORGE H. HUBER, Deceased, as a Will of Real and
Personal Property.

GEORGE HUBER THOMSON and Others, Appellants; EMMA M.
HUBER and Others, Respondents.

First Department, February 1, 1918.

Will — probate — " examination " of subscribing witnesses — reason
for admitting will to probate contrary to testimony of subscribing
witnesses.

Under section 2611 of the Code of Civil Procedure, providing that " Before
a written will is admitted to probate, two, at least, of the subscribing
witnesses must be produced and examined, if so many are within the
State, and competent and able to testify," an " examination " contem-
plates such a particular inquiry into the facts and circumstances sur-
rounding the execution as is calculated to satisfy the surrogate that the
will is genuine, and that it was validly executed. Merely asking a
witness to identify his signature is not a sufficient compliance with
the Code.

The mere fact that such witness was recalled before the trial was concluded
at the instance of a special guardian, and asked certain questions which
had nothing to do with the *factum* of the will, did not constitute a
sufficient examination.

Furthermore, it was an abuse of discretion not to permit said witness to
be recalled for cross-examination, as it would have been unjust to compel
the contestants to make him their own witness.

The reason for providing that two subscribing witnesses must be produced
and examined before a will is admitted to probate is that the surrogate
may be satisfied by proof that the requirements of law were observed
in the execution and publication of the instrument.

When two witnesses are available, both must testify to the publication
of the will by the testator, and that they signed it at his request, although
it has been held that not every fact concerning the due execution of the
will need be testified to by each witness.

The reason for permitting a will to be admitted contrary to the testimony
of the subscribing witnesses, where the court is satisfied that it was
properly executed is, that otherwise a premium would be put on the
" holding up " of an estate under threat by the witness to testify against
due execution.

APPEAL by George Huber Thomson and others from a
decree of the Surrogate's Court of the county of New York,

entered in the office of said Surrogate's Court on the 13th day of July, 1917, admitting to probate a paper purporting to be the last will and testament of George H. Huber, deceased.

*Alfred E. Hinrichs*, for Alfred E. Hinrichs, as special guardian for the appellant Carrie T. Coe, an incompetent.

*Frederick J. Moses* of counsel [*Jabish Holmes, Isham Henderson* and *Thomas M. Healy* with him on the brief; *Moses & Henderson* and *Thomas M. Healy*, attorneys], for the appellants Thomson and Thiel.

*Max Bernstein*, for Max Bernstein, as special guardian for the appellants Vera Bauman and others, infants.

*Morgan J. O'Brien* of counsel [*Albert B. Boardman* and *J. Sidney Bernstein* with him on the brief; *J. Sidney Bernstein*, attorney], for the respondent Emma M. Huber.

SHEARN, J.:

George H. Huber, the testator, died at the age of seventy-two from Bright's disease, from which he had been suffering for eight or nine years. His will, which has been probated, was executed on the night of June 18, 1916. For about a week prior thereto the testator had been confined to his house under the daily care of his physician, Dr. Scofield. On June eighteenth he was so sick that the doctor called into consultation Dr. Winters. In the afternoon testator's personal attorney, M. Carl Levine, called at the house, as he had done daily for several days, and in the evening both Dr. Scofield and the lawyer were again sent for. When the doctor arrived he found Mr. Huber in a weaker condition than he had ever seen him before. He was then suffering from dropsy of the lungs to such an extent that he had to be propped up in bed in order to get his breath. Later Mr. Levine arrived and went to the bedroom. Dr. Scofield testified that he heard Mr. Huber give the lawyer instructions for drawing the will. Mr. Levine contradicts the doctor and says that he requested the doctor to leave the room and that no one was in the room while he received the testator's instructions. Mr.

Levine went into the dining room and wrote out the will in the presence of Mrs. Huber and one Albert J. Ean, an employee of the testator. The will bears evidence on its face of having been very hastily written. In the second clause the Hicksville Opera House was devised " to my brothers Andrew, Lewis and the children of my dead sisters equally share and share alike (including also Eliza Theil)." The words in parentheses were written in after the draft and before execution. It will be noted that the names of the children are not given. Yet the lawyer wished to have the names of the children and tried with Mrs. Huber's assistance to get them out of the family bible, but could not because they were written in German script. The fact that he did not go to Mr. Huber and ask him the names of these children is quite significant as to the condition that Mr. Huber was in, for the lawyer admittedly wanted the names. It also appears that while the draftsman put in " sisters " the decedent had only one sister. As a fatal attack of Bright's disease ends in coma, in spite of the fact that the testator lingered four days it appears from the foregoing that the circumstances of the execution of the will warranted full investigation. This was further warranted by the fact that this hastily prepared document devised the entire estate, except the opera house above referred to (and $200 to the Lutheran Cemetery), to testator's wife, whereas in 1912 Mr. Huber had made a will by which, after making minor bequests, he created a trust in the residue of his estate, and provided that his widow should, during her life, have at least fifty per cent of the income and in the discretion of the trustees seventy per cent. Michael L. Thiel and George Huber Thomson, the latter claimed to be an illegitimate son of Mr. Huber, were each to receive fifteen per cent of the income during the life of the widow. After the death of the widow, Michael Thiel would receive fifteen per cent of the principal and the balance would go to George Huber Thomson. The evidence is that the testator was very fond of George Huber Thomson and nothing had occurred to bring about a rupture. There is also evidence that as late as May 30, 1916, the testator told one Schafhauser, who had been the manager of Huber's Casino for seventeen years, that he felt that he had little time left to live, that

he had his affairs all in shape and that " lawyer Hasbrouck " had the will, which " fixed it " so that Mrs. Huber could not get the principal but would have a certain income; and that he said: " Georgie is a Huber, all right. He is my son. * * * I am obliged to look after Georgie." These circumstances are stated to show that the contest in the Surrogate's Court was a genuine one and that the circumstances attending the execution of the deathbed will were such as to require careful investigation.

The witnesses to the will in question were Dr. Scofield and one John Schlaefer and his wife Anna. On the trial the proponent called Dr. Scofield and he was examined at great length concerning the *factum* of the will and the surrounding circumstances. While his testimony was shaken in some particulars and contradicts that of Mr. Levine, who was also called and testified quite fully concerning the circumstances, Dr. Scofield's testimony is quite persuasive that the testator was of sound mind and understood what he was doing and that all formalities were duly observed. The two other witnesses, the Schlaefers, were in the court room during the trial. Before either was called as a witness, the attorney for the proponent endeavored to read the will to the jury, but the contestants' objection on the ground that the *factum* had not been proved by two witnesses was sustained. Thereupon, the proponents called John Schlaefer, showed him the will and asked him the one question, referring to the words " John Schlaefer, 206 East 115th Street, New York City," " I ask you whose handwriting those words and those numerals are? " Schlaefer answered, " Mine." Proponents' counsel then said, " That is all," and contestants' counsel said, " No questions." Proponents then called Mr. Levine and, after his testimony was concluded, proponents' counsel began to read the will to the jury when he was interrupted with the objection that it had not been authenticated by the testimony of two subscribing witnesses. Contestants' counsel called attention to the fact that proponents' trial counsel had stated at the opening of the trial, and later had reiterated, that it was his intention to waive the probative force and value of the attestation clause. The objection was overruled and the will was read, whereupon contestants' counsel requested

to have Schlaefer recalled for cross-examination. This was refused by the surrogate, who said that the contestants might call Schlaefer as their own witness, whereupon the proponents rested.

It is quite apparent from the foregoing that neither side wished to be responsible for any testimony to be given by Schlaefer and that each side was endeavoring to force the other side to produce and examine the witness. The facts back of it all are not in evidence, but it appears from the offer of proof, subsequently made, that Schlaefer had apparently solicited both sides to bribe him by intimating that if he told the truth it would appear that Mr. Huber did not know what he was doing when he signed the will; that he was propped up in bed and the paper was put before him as an important paper that his lawyer wanted him to sign; that he gave no directions as to what was to go into it; that he did not declare it to be his will or ask the witnesses to sign it.

Section 2611 of the Code provides that " Before a written will is admitted to probate, two, at least, of the subscribing witnesses must be produced and examined, if so many are within the State, and competent and able to testify." Anna Schlaefer was not called although in the court room.

There is thus presented the question whether the production of John Schlaefer and merely asking him to identify his signature was such an " examination " as the Code contemplates and requires. We think that it is quite clear that it was not.

It is not necessary to resort to the law dictionaries to determine what the word " examination " means, either as used in this statute or as commonly understood. For the better security of property rights and protection against fraud, the Legislature has provided that certain requirements shall be observed in the execution and publication of a will. (See Decedent Estate Law [Consol. Laws, chap. 13; Laws of 1909, chap. 18], § 21.) These requirements are few and simple, but they are essential. The reason for providing that two subscribing witnesses must be produced and examined before a written will is admitted to probate is that the surrogate may be satisfied by proof that

the requirements of law were observed in the execution and publication of the paper propounded as a will. If the mere proof of the genuineness of the signatures of the subscribing witnesses constituted an " examination " within the statute, that would be tantamount to admitting a will on the force of the attestation clause alone, without any testimony as to the circumstances. Such a rule would render meaningless and purposeless section 2614 of the Code, providing: " Before admitting a will to probate, the surrogate must inquire particularly into all the facts and circumstances, and must be satisfied with the genuineness of the will, and the validity of its execution." An " examination " under section 2611 of the Code contemplates such a particular inquiry into the facts and circumstances surrounding the execution as is calculated to satisfy the surrogate that the will is genuine and that it was validly executed. But, the respondents point out, it has been held that not every fact concerning the due execution of the will need be testified to by each witness. True, but certainly when two witnesses are available, both must testify to the publication of the will by the testator and that they signed it at his request. Then, too, it is suggested that, as the will may be admitted to probate contrary to the testimony of both the subscribing witnesses if the court is satisfied by all the evidence in the case that the will was properly executed, it is unreasonable to compel the proponent to bring out from the witness or run the risk of bringing out from a witness that the will was not properly executed. That there is a good reason for requiring two witnesses to be examined when possible there can be no doubt, but in any event the Legislature has so required. The reason for permitting a will to be admitted contrary to the testimony of the subscribing witnesses is that otherwise a premium would be put on just such practices as are hinted at here, namely, " holding up " an estate under threat to testify against due execution. Certainly the safest and best policy is to follow the statute. Especially important was it in such a case as this, for the reasons above indicated.

The mere fact that before the trial was concluded, Schlaefer was recalled at the instance of the special guardian, and asked certain questions which had nothing to do with the

*factum* of the will, did not constitute the required examination, for, although the witness was examined, he was not examined concerning the *factum* of the will, which, with the surrounding circumstances, as above pointed out, is what the Code section contemplates he shall be examined about. It was error to admit the will to probate without examining at least two of the subscribing witnesses.

Furthermore, it was an abuse of discretion not to permit Schlaefer to be recalled for cross-examination. Compelling the contestants to make him their own witness would have been most unjust. True, the contestants rejected one opportunity to cross-examine, but they were misled into doing so by the surrogate's having previously sustained their objection to admitting the will until it was proved by two subscribing witnesses. Clearly it had not been so proved when Schlaefer's direct examination was finished, and they were entitled to rest upon the assumption that it would be necessary for the proponents to recall him and examine him as to the *factum* of the will. Even if the parties were shrewdly contending for position, the matter must not be finally disposed of as though it were all a game. Schlaefer's testimony (or that of his wife) concerning the *factum* of this will should have been taken for whatever it was worth. In this view of the case it is unnecessary to discuss the further point with respect to the rejection of the evidence of certain alleged admissions made by Schlaefer tending to disprove due execution of the will.

The decree is reversed and a new trial ordered, with costs to appellants to abide the event.

CLARKE, P. J., LAUGHLIN, SCOTT and PAGE, JJ., concurred.

Decree reversed, new trial ordered, costs to appellants to abide event.